May it please the Court, I'm Scott Daniels on behalf of the appellant in this case. The rejections below should be reversed for each of four reasons. First, our dependent claim 13 requires that the price be determined at least partially by the results of a buyer in an auction. A similar auction limitation appears in claim 22. The Patent Office, in its decision, calls the disclosure in Asahi of three falling prices a reverse auction. And then it relies on that disclosure of a reverse auction to satisfy our auction limitation. The Patent Office is wrong for two reasons. First, our specification distinguishes between an auction, the so-called eBay model, in which buyers bid up a price, and a reverse auction, the so-called Priceline model, where sellers competitively bid down a price. But in this case there's no bidding, is there? No, there isn't. They're playing a game, and the level of skill established by the talent, that determines what the price is going to be. And that could be up or down. Yes, it could, Your Honor, but... Isn't that a form of auction? No, it's not. The specification specifically treats the price-determining activity as something separate from the auction. They're dealt with separately. And in Judge Love's claim construction opinion in the earlier infringement decision, he specifically said that the auction was not the PDA. Suppose I disagree with that. Do you have a separate argument that the Board misunderstood even the broadest reasonable meaning of auction, which inherently involves competing buyers on the regular auction, competing sellers on the, whatever, whether it's reverse or some other name, auction, and at least the prior art that they relied on doesn't involve, I guess in this case, competing sellers? Correct, Your Honor. In fact, that's the second reason that we want to press here, that the ordinary and common meaning of an auction, a reverse auction, is always going to involve either a seller or a buyer competing with bids.  With bids. And in this case, the Asahi reference has three falling prices that aren't bids at all. Translate bids for me, please. A bid is a suggestion of a price at which somebody will buy or sell the product. I'm sorry, so I thought that the argument you're making, and now I'm not sure, that auction inherently requires competing sellers on that side. Let's forget about buyers, competing buyers bidding things up. We're not talking about that. We're only talking about prices coming down, which is only going to happen on the selling side, so something like a reverse auction, if that's the right name for it. Are you making the argument that auction, let's call it a reverse auction, requires competing sellers? Yes, because otherwise there's no bidding back and forth. If you don't have multiple sellers in a reverse auction, for instance in the Priceline model, you don't have multiple hotels bidding down the price. The price just isn't going to come down. There's going to be one offer, and there won't be a counteroffer to that, so the price will never come down. You'll never have that essential feature of the reverse auction, the price coming down. So whether— Why doesn't the PDA give that essential feature and compel the movement of price? The PDA is—there are many—the point is that the specification clearly distinguishes between the PDA and the auction. It seems to me that under the claims that both the PDA and the auction, that it can be a PDA or it can be an auction. Well, Your Honor, there is Claim 5 of the case, which tries to define the PDA as a species to limit the scope of the claim. And it says—I don't remember exactly, but essentially that the PDA is a particular kind of game. I think it says a video game. Whereas Claim 13 doesn't—isn't written in that way. It's written to say that the price is, in addition, determined at least partially by an auction. So I think that the PDA and the auction are two distinct steps. And Claim 13 is requiring not that the PDA be an auction, but that the price also be determined at least partially by participation of the buyer in an auction. So if your claims use the word auction and you can have both a PDA and an auction in the claims, how does that pull you out from underneath the front of the earth? Because the Asahi reference, which is relied upon by the Patent Office, is at page 856 of the appendix. It has three falling prices, and that disclosure doesn't constitute an auction. For the first reason, that at most it's a reverse auction, and even if the term auction encompasses both the normal buyers bidding up a price and sellers bidding down a price, that you don't have that bidding in Asahi. The price determinations of the first price, the second price, and the third price are determined by the results of someone playing a game, not someone bidding in an auction, whether a buyer or a seller. And again, I'd return to our specification, which talks about the PDA and the auction as distinct features. They don't say the PDA could be an auction. In fact, it's described differently. And when we went to write our dependent claims to narrow the PDA to certain species, we said the PDA could be a video game. When we went to talk about auctions, we didn't take that form in our claim drafting. We said the price is determined at least partially upon participation of the buyer in an auction. So if we had intended, I think one skill in the art, looking at our claims, would have thought that if we intended the auction to be a species of the PDA, we would have said it in just that manner in a dependent claim. The second reason that the rejection below should be reversed is that the prior art relied upon by the examiner fails to meet the limitation in Claim 1 of accepting a first request from the buyer to buy a product for a price to be determined within a price range. Now, the patent office is wrong for two reasons here. First, having to do with the part of the limitation that says the buyer requests to buy for a price to be determined. Now, at page 56, which has the relevant disclosure from Asahi, there's a description of the game. There's a standard price of 22,000 yen. If you win, it could be 16,800 yen. If you win a second time, it's 13,800 yen. Now, he said, I'm going to try my luck. He won twice, and then he lost on the third go. And then he says, I decided to place an order here. So the order in Asahi is not for a price to be determined, as in our claim limitation. There is a temporal distinction. In our claims, the game is played first, and then the price is determined. In Asahi, the game is played, the price is determined, and then the order is placed. So there's a temporal distinction between the two. Also, Asahi does not satisfy the within a price range requirement, that limitation. So the patent office admits in its brief that this price range can reasonably be construed with its ordinary meaning as having upper and lower limits. And Judge Love, in fact, said something to a similar effect. So there's an upper and a lower limit. Looking at page 856, we see, of course, there's an upper limit. That's the 22,000. So if you look at this in terms of a range of prices, what difference is there if you have an upper, middle, and lower limits under Asahi, or you have a continuous drop in the price or rise in the price under your patent? That's not the distinction that we're making here, Your Honor. What we're saying is that Asahi does not disclose a lower limit. You could, for instance, I think this is the government position, that the 13,800 yen is the lower limit. But that's not the case, because the buyer could win on the third try. And if the buyer won, the 13,800 yen would not be the lower limit. There would be a different price. And the reference does not disclose what that lower limit is. I'd also point out that the buyer is asking to buy within the range. That would not be the case in Asahi. That is, if 13,800 is the lower limit to the range, then there would be the possibility, if the buyer wins the third go, that the price would be outside that lower limit of the range. So it's really a very different way of making the presentation to prospective buyers. And it is, I think, a very non-obvious way. If you look at… You're into your rebuttal time, but I just wanted a warning. Thank you, Your Honor. I'll just finish up this point then. If you look at Asahi and you think about the time of our application, this was June 1999, and it was the very early days of e-commerce. And you read the whole reference here. It's a very different feel from what we have now. And the man tries to load the image, and it takes three minutes to do it. And he's reluctant to make the deal because he's scared that his credit card will be taken. And he talks about calling the bank to make sure that he's actually the one using the credit card. So it's a very different, much more primitive time in this analysis. So these differences that we are trying to draw about the temporal nature of the offer, of the game itself, the difference between an auction and playing the game and so on, these are all significant differences as of that time. And let me just point out in the last item here that this reexamination was brought by the titans of the industry. It was brought in by Google, Yahoo, and I believe eBay. And this was the very best prior art that they could come up with. And I think it woefully falls below meeting the limitations of the claim. I'll reserve the rest of my time for rebuttal, Your Honor. Thank you. Thank you, Your Honor. Commissioner LaMarca? May it please the Court, Your Honor. If possible, I'd like to address Howland's second to the first. He discussed Claim 1, the independent claim, and I believe his point was in the independent claim, Claim 1, there's a requirement that the price of the… There's a request to purchase a product, accepting at first request from the buyer to buy the product for a price to be determined. I think it's the agency's position, if you look at the examiner's findings as well as the board's findings on this, in Asahi, one thing that he missed is if you look at Asahi, there is a request that happens before the price is determined. I believe Asahi says, I choose the CD player. If you look at page 856, I think it's the page in the joint appendix where opposing counsel kept pointing out for you, you'll see at the very top of page 856 it says, I choose CD radio cassette recorder for the trial, which means there's a request for a particular product that that particular purchaser wants to buy. Now, once they've made that request, then they go forward and there's a standard price listed of 22,000 yen. If you win once, 16,800. If you win the second time, 13,800. So it's our position that just like the claim requires, there is a request that's made up front prior to the price being determined, and there also is a range. I think that's the second point, which is heavily argued in the briefs as well as responded to in our brief, that in their view, Asahi doesn't adequately disclose a price range. Well, it's correct, we don't disagree that Asahi discloses discrete prices like one price, second price, third price based on how many times you win. It doesn't show like a sliding scale, as you pointed out, Your Honor. But if you get to a point where you win outright and you don't pay. Right, if you just keep winning, winning, winning. Is that a range? Yeah. Well, I think what the examiner pointed out, even if that were one possible embodiment of the disclosure, nevertheless the disclosure also shows samples where if you win two times, the third time you lose, there's definitely a range there. And in his view, the examiner's view, there's a range. And furthermore, when you look at the spec, because we're trying to interpret language from the claim here, the terminology, price range, what we pointed out in our brief, if you look at the specification of the 253 patent, and we go to page A21 of your joint appendix at column 2, column 2 down around halfway down, around line 35, they're specifically talking about the price range. They say the actual range may be scaled to a set of prices, for example, $1,100 and $1,200, just like Asahi, discrete price amounts that equal the range. And if you read further, and it says here, or it may simply be a single price, such as discounted price for when the buyer either wins or loses. So even the 253 patent contemplates the situation where you might just have a situation where if you win, it's one price, and if you lose, it's the other price. And the 253 patent construes that as a price range. So we think our construction of the terminology price range in Claim 1 is reasonable based upon that disclosure and specification. I think the other point that he made was, well, there's no lower limit, but if you look at Asahi, the exact example Asahi shows, $16,800, $13,800, there's a lower limit in that example. So that's our position on that. Can you address the auction question, which seems to me the most challenging one for you? Now, what we just talked about was the independent claim, Claim 1, which really addresses a lion's share of the issues. But the auction question comes from a dependent claim, Claim 13, and I believe one other claim, 22. And the auction question is a little bit more difficult, but let me try to explain the agency's position. If we go to the examiner's answer, and let me take you there, where the initial construction of the terminology and the claim language as well as the findings of the reference. Let's look at what the examiner says, because it will help us at least understand how the agency gets them. And if I take you to that page in the answer, here we go. Page A, I apologize for taking a bit of time to get to this page. Page 2121, A2121. Right there we're talking about Claim 13, and the examiner in his answer is responding to this precise argument that was made here today by appellant. And if you look at the bottom of A2121, here's where the examiner looks at the claim language and construes it. It says, the examiner finds that offering of a product at a variable price constitutes an auction of the product. Offering a product at a declining price, $22,000, $16,000, $13,000, correlates to a reverse auction. Additionally, when you look at the specification, column 4, line 39, it explicitly shows that for the reverse auction sales model, the evidence described in the patent owner's specs explicitly supports application of a reverse auction, and the examiner finds no evidence to exclude reverse auctions from the term auction. So I guess my basic question is, why does that not completely misunderstand any English language meaning of the term reverse auction? Well, let's go look at the spec and let's see if I can help us with that, Your Honor. If I go to page A21 of the specification, which is the 253 patent, and then column 1, first of all, on column 1 on the left-hand side, right around lines 30 to 35, Is where it refers to price line, the kind of auction. Right, and furthermore, right here, to start out, before we even get to the rejection, this is an admission in the specification that auctions and reverse auctions are well enough. There's no dispute that they're well enough. Now let's go over here to page A22, and we come right down to column 4, lines 35 to lines 45, and I'm right around line 39. For example, using an auction or reverse auction model, the buyer may be entitled to a further discount of the auction or reverse auction price. So I think the way the examiner reads that is, auction is kind of the generic category, and a reverse auction is a type of auction. So when he reads the claim, Let me see if I can identify, and I may not know even the current world very well. I had understood, tell me where I'm wrong, that auction or reverse auction, there's got to be competitors. On the auction side, competing buyers, and reverse auction, competing sellers. I think that's true in price line. I don't think that's true in Rosides or Asahi. Well, there are examples. This is not in the rejection, and it's not in Asahi. You're correct. But just, let's for example, someone puts something on the internet, just to make this easier to understand, and it's a product for sale. And the product starts at a particular price of, let's say, $50, and it sits there. Nobody makes, no one wants to buy it. And a day later, they lower the price to $40. What you just described is a process in which it is open to competing, and you can have an auction in which only one person comes, and that's still an auction. But it had better be open to competing bidders, either on the sale side or the bidder side. Yeah, you're right. In general, that's the way I know of it in normal parlance as well. However, I think what the examiner is saying is, by the fact that you have declining prices, dropping, dropping, dropping, and then at some point, you get to buy at one of those declining prices, in the examiner's view, if you see what he says, he says that that correlates to a reverse auction. And he's saying because there's this correlation to a reverse auction there, he sees that as he's able to read the declining prices as sufficient to render obvious that there'd be a reverse auction. And furthermore, which the examiner did not point out, reverse auctions are not a new technique. They're well known, as admitted in the specification. Suppose I thought that it was reasonably clear that the specification only referenced the price line as a reverse auction, a pre-existing aspect of the priority, would have rendered Claim 1322 obvious if all of the rest were obvious. But the examiner did not say that. He attributed it to Asahi and Rossides, as did the board. What do I do? Well, I mean, if you were to reverse, let's say, the rejection of Dependent Claim 13, let's just say that's what you did, you didn't like that rejection, you didn't feel it was adequate, that doesn't necessarily make the claim patentable. In this case, if that's the end of the story, if this court ends it right there and says, Claim 13, we don't like your rejection, we don't think it's sufficient, we reverse it for these reasons, this case is going to go back to the Patent Office. The Patent Office will have an opportunity to re-look at Claim 13 before they issue any type of re-examination certificate. But I don't know for sure that the court could go beyond that on their own and potentially... No, if it goes back to the... Right. ...could be looked at again... Right. ...under the new Act, would the Commissioner be able to look at it as a violation of Section 101, as on the patentable subject matter? That's a tough question, Your Honor, because this was a re-exam that was requested and under the... it's an ex parte re-exam... Right. ...and even under the new law... It started in 09. But I think even under the new law, ex parte re-exams still exist under the AIA, and even those are still patents and printed publications. Nevertheless, can't the Director at any time on his own initiative, as the statute says, intervene in these? On an ex parte re-exam, he can at any time on his own initiative order an ex parte re-exam. I don't think that language... Under 101. I think the new law for ex parte re-exam does not open it beyond patents and printed publications. I don't believe that portion of the statute has changed. I don't know for sure, but I'm pretty sure that the new law, which I've got here, I've got the statute with me right here. And you know exactly where to turn to? Wow. Yeah, well, these questions, unfortunately, pop up from time to time, Your Honor. But if we were to look at the new law, I believe it's still the same for ex parte re-exam. What this is is an ex parte re-exam, and the power of the Director to sua sponte order a re-exam is in the ex parte context, not in the inter parte context, which does allow for 101, 112, and other issues. So I think we still have the situation where we have an ex parte re-exam, and even if this went back to the agency and you weren't happy with the rejection of Claim 13 and you felt it was inadequate, the agency would have another opportunity at that point before issuing a type of re-examination certificate to re-look at Claim 13 and reconsider, because auctions are admittedly well-known, and reverse auctions are admittedly well-known. So even if the sahih doesn't have the specifics of a reverse auction the way appellant believes it should, this is not in dispute that these are well-known things that are out there. It's known in the field. Does that fact allow us to affirm on that basis, even though it's not the articulated basis of the examiner and therefore the board? Well, we, from our perspective, wouldn't be able to make new grounds of rejection and present them to you. However, the court, what we're really getting at here, I guess, is the question of law, claim construction is a question of law, which you have de novo power on. The other question about the fact findings with regards to the sahih, essentially you could say we don't think there's substantial evidence in that reference to support the finding by the examiner. Now what we're talking about is the court going off and making an independent finding on its own. I'm not so sure. I don't know the answer. But why would it be an independent finding? The specification says expressly, priceline, pre-existence of the art, it's a reverse auction. Right. Is there a factual component left in the ultimate obvious statutory? Yeah, I guess one way to look at that is it's not a dispute because it's admitted. It's effectively admitted by the specification that auctions and reverse auctions are well known, but what you don't have in front of you is a formulation of that admitted fact along with the sahih reference and an obviousness combination. You don't have that in front of you, and I think that's the difficult part, Your Honor. Now, one thing I would like to mention as well, just furthermore, not only does the specification admit that it's well known, but if you go back and if you look at the original request for re-exam, I believe the original request actually did point to other references beyond what can be admitted prior in the specification to show auctions were well known. Unfortunately, the examiner didn't utilize that proposed combination of references and interjections, so what we're dealing with is what we have. That's what's in front of us. But I think the whole part where all this doubt is where we're having discussion, it's all about Dependent Claim 13. We're confident that independent claims, one and all the other independent claims that rise and fall with those, are unpatentable in light of the evidence of the record. We do believe there's substantial evidence to support that. We're defending our rejection for Claim 13 as well, based on the rationale that I've given you on behalf of the examiner. I understand it's the Court's decision to look at that. And the only other claim that we hadn't mentioned was Dependent Claim 11. And Dependent Claim 11 just added one additional feature called tournament play, tournament play between multiple players. And there's another reference in the rejection for Claim 11 called Walker, and that's cited in our brief. And they show, again, that it's well known to have tournament play against multiple players scattered around in different locations over the Internet. And accordingly, we think Claim 11 is unpatentable as well. Thank you, Mr. Lamar. Thank you. Mr. Daniels, you have about a minute and a half left in your time. Thank you, Your Honor. Let me just point out first that our limitation from Claim 1 that we asserted in our opening argument about a request from the buyer to buy is not satisfied by the identification in Asahi of a particular product. Someone can identify a product. That doesn't mean he's offering or requesting to buy that, a request that would result in a contract if that offer were accepted. He's merely identifying it. So the request to buy in Asahi comes only after the game is played, only after the price is determined. On the question of whether this court should refashion the rejection as an obvious one based on price line, I think that the rationale from Rambis decided at the end of last month should be persuasive. That is that an appellate panel should not refashion a rejection or finding of invalidity that was not presented to the appellant below, where the appellant would have the full opportunity to make arguments against that kind of rejection, arguments and declarations and so on. So if the panel feels that, and though it shouldn't, that an auction is obvious, the right decision is to remand to the patent office. If I may just make one closing thought. Thank you, Your Honor. The question of whether the PDA and the auction are separate acts or whether the auction is a species of the PDA, I think is resolved by the passage cited by my colleague from column four of the patent, where it says, using the auction or reverse auction models, the buyer may be entitled to a further discount of the auction or reverse auction, which discount may be greater if the buyer performs well in the PDA. So these are clearly two different activities affecting the price to be paid by the buyer. Thank you. Thank you. That concludes our oral arguments for this morning. I want to thank counsel for their excellent arguments, and this court is now adjourned. All rise. The honorable court is adjourned until tomorrow morning at 10 o'clock a.m. Thank you.